Terry SMITH, Plaintiff–Appellant,

v.

AMERITECH; Ameritech Publishing, Inc.; Sickness and Accident Disability Benefit Plan; Long Term Disability Plan, Defendants–Appellees.

No. 96–4263.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 31, 1997.

Decided Nov. 20, 1997.

Terry J. Lodge (argued and briefed), Toledo, OH, for Plaintiff–Appellant.

Rolf ·Scheidel, Shumaker, Loop & Kendrick, Toledo, OH, Jeffery M. Peterson (briefed), Thomas G. Kienbaum (argued and briefed), Dickinson, Wright, Moon, Van Dusen &· Freeman, Detroit, MI, for Defendants–Appellees.

Before: LIVELY, KENNEDY, and NELSON, Circuit Judges.

## OPINION

KENNEDY, Circuit Judge.

· Plaintiff, Terry Smith, appeals from the District Court's order granting summary judgment in favor of· defendants, Ameritech, Ameritech Publishing, Inc.· (now known as Ameritech Advertising Services), their Sickness and· Accident Disability Benefit Plan ("SADB Plan"), and their Long Term Disability Plan ("LTD Plan") (hereinafter collectively referred to as defendants). Plaintiff alleged that defendants denied him disability benefits in violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461; interfered with his right to future disability benefits in violation of ERISA § 510, 29 U.S.C. § 1140; denied him reasonable accommodations for his disability in violation of both the Americans with Disabilities Act· ("ADA"), 42 U.S.C. §§ 12111–12213, and OHIO REV.CODE ANN.

§ 441202(A); and discharged him without just cause in violation of a collective-bargaining agreement. The District Court granted summary judgment in favor of defendants on all of his claims. For the following reasons, we affirm.

## I.  Facts

In 1991, plaintiff began working for Ameritech Advertising Services as a "premises sales representative." In that capacity, plaintiff traveled through northwestern Ohio and southeastern Michigan selling advertising space in Ameritech's yellow pages directories. On April 16, 1992, while traveling from a personal errand to meet with a business client, plaintiff was injured in an automobile collision. Plaintiff suffered a herniated disc at the T7–T8 level of his spine, causing chronic back pain. Despite the pain, plaintiff continued working for eighteen months, until he took a disability leave of absence on October 19, 1993.

At that time, Ameritech and Ameritech Advertising Services offered two plans which provided benefits to employees who were prevented from working by illness or injury arising outside the scope of employment. The Sickness and Accident Disability Benefit Plan ("SADB Plan") provided qualified employees with short-term disability benefits for up to fifty-two weeks. After receiving SADB Plan benefits for fifty-two weeks, an employee who still is disabled from working becomes eligible for benefits under the Long Term Disability Plan ("LTD Plan"). It is undisputed that both plans qualified as "employee welfare benefit plans" under ERISA, 29 U.S.C. § 1002(1). The original SADB Plan designated the "Company" as the plan administrator. A subsequent modification to the SADB Plan vested the Ameritech Employees' Benefit Committee with

> full discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan. The Committee decides conclusively for all parties all questions arising in the administration of the Plan and any decision of this committee is not subject to further review.

In practice, Ameritech's Occupational Medicine Department made the initial decisions regarding claims for benefits under the SADB Plan, and the Employees' Benefit Committee convened to review the appeals of applicants who had been denied benefits.

Upon plaintiff's application, Ameritech initially approved SADB Plan benefits from a start date of October 26, 1993. The SADB Plan required plaintiff to submit medical disability forms from his physician to support his claim for benefits. Between October, 1993 and July, 1994, plaintiff submitted several letters and reports from physicians to Ameritech's Occupational Medicine Department. These reports were authored by three doctors: Dr. Zambrano, plaintiff's physician; Dr. Sullivan, an orthopaedist specializing in spinal surgery; and Dr. Spetka, another specialist who provided a second opinion on plaintiff's condition. In a letter dated October 6, 1993, Dr. Sullivan reported his initial diagnosis that plaintiff had "a disc herniation at this [T7–T8] level, although it is not striking." He recommended that plaintiff "modify his activity, take medication, and 'live with this problem,'" because surgical intervention "would be a somewhat formidable procedure" that is indicated "only for intractable pain." Sometime in November of 1993, Dr. Zambrano submitted a report to Ameritech that diagnosed plaintiff with a herniated disc and osteoarthritis and stated that the date he could be expected to return to work was "undetermined at this time."

The next report from Dr. Zambrano, dated December 3, 1993, reported that plaintiff could not work at that time because he "has pain on any exertion; lifting, bending, standing for a long l[ength] of time." It also reported that plaintiff could be expected to return to work on February 1, 1994. Dr. Sullivan's next letter, dated January 3, 1994, reiterated that a non-operative plan of "essentially 'living with' his disability and getting on with his life" was preferred over surgical intervention. Dr. Sullivan's report to Ameritech dated January 19, 1994 reported the same diagnosis and plan but postponed the return to work date to June 1, 1994. In February, Dr. Sullivan issued two more reports recommending the same non-surgical treatment plan and estimating the

same return-to-work date of June 1, 1994. Dr. Sullivan submitted another report on March 3, 1994, that was based on plaintiff's February appointment and reached the same conclusions. Eight days later, Dr. Sullivan issued another report based on the same February physical examination. This report stated that plaintiff was "totally disabled" and could not be expected back to work until August 1, 1994.

Ameritech's Manager of Sickness Disability Administration, Dr. Anfield, wrote a letter dated March 23, 1994 to Dr. Sullivan concerning the medical basis for plaintiff's disability benefits. Dr. Anfield wrote that, while plaintiff's "conservative treatment plan of physical therapy" had not led to any improvement in his apparent condition, his reluctance to pursue surgical treatment suggested "that the employee does not find his discomfort so severe as to be intolerable or totally disabling." Dr. Anfield commented that this seemed to conflict with Dr. Sullivan's determination that plaintiff was "totally disabled." He concluded that he could not "continue to certify the employee's receipt of wage indemnity under the company's sickness disability benefits plan without particularized and detailed data describing the employee's symptoms, his impairment and how he is, in fact, totally disabled." Dr. Anfield's letter warned Dr. Sullivan that, without a response, plaintiff's short-term disability benefits would lapse in ten working days.

In response, Dr. Sullivan issued a brief letter to Dr. Anfield, dated March 24, 1994, stating that he had already provided his diagnoses of plaintiff's medical condition and that plaintiff "continues with the same restrictions." In a letter dated April 28, 1994, Dr. Spetka provided a second opinion concurring in Dr. Sullivan's diagnosis and non-surgical treatment plan.

Despite Dr. Anfield's warning that plaintiff's disability benefits would end in ten working days, plaintiff apparently continued to receive regular payments from Ameritech. On May 19, 1994, Ms. Jean Sell, from Ameritech's Occupational Medical Department, talked to plaintiff on the telephone. She subsequently sent plaintiff a letter, dated June 13, 1994, in which she reported that the

Occupational Medical Department interpreted his medical evaluations as indicating that he had "reached a plateau" in his recovery and was "at the end of healing." The letter also informed plaintiff that "[b]ecause you have been released to return to work and have permanent restrictions that cannot be accommodated within your present position of outside salesperson, a Medical Priority Placement is being initiated to attempt to place you in another position within your department or elsewhere within the company." Sell told plaintiff that one of his supervisors at Ameritech Advertising Services would contact him and advise him of what he needed to do. Nevertheless, plaintiff continued to receive benefits payments.

Plaintiff subsequently submitted an additional letter from Dr. Sullivan, which was dated July 25, 1994 and written in response to a request for "specifics regarding [plaintiff's] limitations." It reported plaintiff's condition as follows:

> The patient essentially is not fit for any bending, lifting, twisting carrying, stooping, or reaching type of activities. He can walk for only brief periods of time, by that I mean 15 to 20 minutes. Standing should be limited. Essentially that plaintiff is fit only for the most sedentary type of employment. I consider these restrictions to be permanent.

In his complaint, plaintiff conceded that "[d]uring the spring of 1994, Plaintiff was cleared to work with permanent physical restrictions." The parties agree that plaintiff was not qualified for his "premises sales representative" position, which, as plaintiff testified at deposition, required the lifting and carrying of yellow pages books, which "would get quite heavy at times." During August of 1994, defendants attempted to find a position for him that would accommodate his request for sedentary employment and his other physical restrictions. Meanwhile, plaintiff continued to receive benefits payments.

In a September 1, 1994 interoffice memorandum to Sandra Sterling, who worked in Ameritech Advertising Services' Human Resources Department, Jean Sell approved the payment of SADB Plan benefits to plaintiff covering the period through September 9,

1994. At that time, plaintiff would be tested and it would be determined whether he could be placed in another position through defendants' "Medical Priority Placement" procedure. Plaintiff took and failed a typing test on September 9, 1994. Although his eligibility for disability benefits apparently changed on that date, Ameritech did not tell plaintiff that he was no longer approved for benefits under the SADB Plan until the middle of October. In a letter dated October 14, 1994, Jean Sell informed plaintiff that he had been eligible to receive "Sickness Disability benefits" through the ninth of September but that his SADB Plan benefits ended when he was tested as part of the "Medical Priority Placement" procedure. The letter instructed plaintiff that the Human Resources Department would be contacting him concerning his time off work after September 9, 1994.

On October 17, the steward of plaintiff's union, Jodie Zychowicz, filed a grievance challenging the termination of plaintiff's disability benefits. According to plaintiff, Zychowicz met with Doris Bennett, one of plaintiff's supervisors, the next day and learned from her that plaintiff's employment was going to be terminated. Zychowicz also learned from Bennett that Ameritech had accommodated an employee who worked in Indiana and was disabled by multiple sclerosis by reassigning him to a delinquent accounts collection position that he could perform from his home. On October 18, 1994, Bennett, Zychowicz, Donald Stanley, another one of plaintiff's supervisor's, and Sandra Sterling apparently discussed whether plaintiff could be provided the same accommodation. Zychowicz stated in her affidavit that either Bennett or Stanley stated "that Ameritech was not going to give Smith a temporary job because he was disabled and if the position were terminated, Ameritech would be obligated to find him another job." She also stated that one of plaintiff's supervisors stated that "the company was not about to pay long-term disability to an employee with that low amount of service," and that "something had to be done with plaintiff" because he had been receiving short-term disability payments for almost one year.

Plaintiff received a letter, dated October 19, 1994 and signed by Doris Bennett and Don Stanley, that informed him that the payments he received covering the period from September 12, 1994 through October 19, 1994 had been reclassified from disability benefits to "Personal Paid Days." The letter also informed plaintiff that because Ameritech Advertising Services' Human Resources Department had been unable to find a position that satisfied plaintiff's treating physician's recommendation for sedentary work, his employment status terminated October 19, 1994. In December, plaintiff appealed the termination of his SADB Plan benefits. Ameritech's Employees' Benefit Committee met on March 14, 1995 and upheld the decision to terminate plaintiff's benefits.

Plaintiff filed an eight-count complaint in the District Court on August 18, 1995. Both parties agreed with the District Court's conclusion that plaintiff's complaint essentially advanced four allegations: (1) that defendants denied him disability pay in violation of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461; (2) that defendants interfered with his disability benefits in violation of ERISA § 510, 29 U.S.C. § 1140; (3) that defendants failed to accommodate his disability in violation of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12111–12213, and OHIO REV.CODE ANN. § 4412.02(A); and (4) that defendants discharged him without just cause in violation of the collective bargaining agreement that established the terms of his employment. Plaintiff voluntarily withdrew federal and state common-law claims that were preempted by ERISA. After a period of discovery, defendants filed a motion for summary judgment, which the District Court granted in full on October 18, 1996. The District Court found that (1) defendants' decision to deny plaintiff disability benefits was not arbitrary or capricious; (2) that plaintiff had failed to show that defendants intentionally interfered with his right to disability benefits; (3) that defendant had just cause to discharge plaintiff; and (4) that summary judgment was appropriate on plaintiff's disability discrimination claims, because he had failed to raise a genuine issue regarding whether he was an "otherwise qualified indi-

vidual" entitled to reasonable accommodation under the ADA and OHIO REVISED CODE § 4112.02. This timely appeal followed. · ·

## II. Discussion

### A. Standard of Review

We review a District Court's order granting summary judgment de novo. *See, e.g., Roush v. Weastec, Inc.*, 96 F.3d 840, 843 (6th Cir.1996). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED.R.CIV.P. 56(c). Although we draw all reasonable inferences in favor of the non-moving party, *see, e.g., Terry Barr Sales Agency, Inc. v. All–Lock Co.*, 96 F.3d 174, 178 (6th Cir.1996) (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587–88, 106 S.Ct. 1348, 1356–57, 89 L.Ed.2d 538 (1986)), "the mere existence of a scintilla of evidence in support of plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252, 106 S.Ct. 2505, 2512, 91 L.Ed.2d 202 (1986).

### B. Plaintiff's ERISA Claims

On appeal, plaintiff challenges the District Court's decisions regarding both of his claims under ERISA, 29 U.S.C. §§ 1001–1461. Plaintiff first argues that the District Court improperly granted summary judgment on his claim contesting defendants' decision to terminate his SADB Plan benefits under 29 U.S.C. § 1132(a)(1)(B).[1] He also challenges the District Court's grant of summary judgment in favor of defendants on his other ERISA claim, which alleged that Ameritech

violated ERISA § 510, 29 U.S.C. § 1140 by intentionally interfering with his right to receive benefits under the LTD Plan.[2] We consider each of his claims in turn.

### 1. Termination of SADB Plan Benefits

■ In *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), the Supreme Court held "that a denial of benefits challenged under § 1132(a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine the eligibility for benefits or to construe the terms of the plan." 489 U.S. at 115, 109 S.Ct. at 956. We apply the arbitrary and capricious standard of review in this case because the SADB Plan expressly grants the Ameritech Employees' Benefit Committee "full discretionary authority to interpret the terms of the Plan and to determine eligibility for and entitlement to Plan benefits in accordance with the terms of the Plan."

■ When applying this deferential standard, we must decide whether the plan administrator's decision was "rational in light of the plan's provisions." *Daniel v. Eaton Corp.*, 839 F.2d 263, 267 (6th Cir.1988); accord *Yeager v. Reliance Standard Life Ins. Co.*, 88 F.3d 376, 381 (6th Cir.1996) (quoting same). In other words: " 'When it is possible to offer a reasoned explanation, based on the evidence, for a particular outcome, that outcome is not arbitrary or capricious.' " *Davis v. Kentucky Fin. Cos. Retirement Plan*, 887 F.2d 689, 693 (6th Cir.1989) (quoting *Pokratz v. Jones Dairy Farm*, 771 F.2d 206, 209 (7th Cir.1985)). In conducting this review, we "consider only the facts known to the plan administrator at the time he made his decision." *Yeager*, 88 F.3d at 381; accord

---

1.  29 U.S.C. § 1132(a)(1)(B) provides that a "participant or beneficiary" may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

2.  29 U.S.C. § 1140 provides, in pertinent part, as follows:

It shall be unlawful for any person to discharge, fine, suspend, expel, discipline, or discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan....
*Id.*

*Miller v. Metropolitan Life Ins. Co.*, 925 F.2d 979, 986 (6th Cir.1991).

The terms of the SADB Plan provide that employees who have worked six or more months are "qualified to receive payments under the Plan on account of physical disability to work." Defendants presented affidavit testimony that the Employees' Benefit Committee has consistently construed the term "disability" to mean a physical inability to return to work any job at Ameritech with or without reasonable accommodations. Under this construction, an employee becomes ineligible for SADB Plan benefits when he or she is cleared to return to work, even if some physical limitations render the employee unable to perform in his prior position. On appeal, plaintiff does not expressly challenge this construction of the plan. Instead, he contests the ultimate decision of the Employees' Benefit Committee that, under this provision, he became ineligible for SADB Plan benefits.

The District Court concluded that the medical record before the Employees' Benefit Committee supported its decision that plaintiff had been cleared to return to sedentary work and, therefore, was no longer eligible to receive short-term disability benefits. We agree. The letters and reports of plaintiff's physicians recommended a non-operative treatment plan and suggested that plaintiff learn to "live with" his medical problem because the only alternative, "a somewhat formidable" surgical intervention, was indicated "only for intractable pain." It was reasonable for the Employees' Benefit Committee to disbelieve Dr. Sullivan's conclusion that plaintiff was "totally disabled"; the medical reports that plaintiff provided indicated that he did not "find his discomfort too severe as to be intolerable or totally disabling." Furthermore, it was reasonable for the Committee to discount the probative value of the "totally disabled" diagnosis because it was based entirely on an older physical examination that previously had been the basis of a less severe diagnosis. Dr. Sullivan's letter dated July 25, 1994 provided additional support for their conclusion that plaintiff could return to work in some capacity: although Sullivan reported that plaintiff was unable to perform "any bending, lifting, twisting carrying, stooping, or reaching type of activities," he concluded "that plaintiff is fit only for the most sedentary type of employment."

In summary, it was not arbitrary or capricious for the Employees' Benefit Committee to conclude that "the medical documentation indicated [plaintiff's] ability to return to work with restrictions." Plaintiff acknowledged as much in his complaint, where he conceded that "[d]uring the spring of 1994, plaintiff was cleared to return to work with permanent physical restrictions." Because plaintiff has failed to raise a genuine issue as to whether it was arbitrary or capricious for the SADB Plan administrator to conclude that this rendered plaintiff ineligible for SADB Plan benefits, summary judgment was appropriate on this claim.

### 2. Intentional Interference with ERISA Benefits

Plaintiff next challenges the District Court's grant of summary judgment on his claim that Ameritech interfered with his right to benefits under its LTD Plan, in violation of ERISA § 510, 29 U.S.C. § 1140. Under § 510, it is illegal for an employer to "discriminate against a participant or beneficiary for exercising any right to which he is entitled under the provisions of an employee benefit plan ... or for the purpose of interfering with the attainment of any right to which such participant may become entitled under the plan." 29 U.S.C. § 1140. Plaintiff argues that Ameritech violated this section by interfering with his attainment of long term disability benefits by (1) retroactively reclassifying approximately six weeks of SADB Plan benefits that plaintiff had received and (2) discharging plaintiff one week before the date that he would have qualified for LTD Plan benefits, had he continued to receive short-term disability benefits up to that date.[3]

---

3. Plaintiff's complaint in the District Court alleged that defendants also violated § 510 by discharging him in retaliation for exercising his rights to receive benefits under the SADB and LTD Plans. Because plaintiff does not raise this retaliation claim on appeal, that issue is not

■ To state a claim under § 510, the "plaintiff 'must show that an employer had a specific intent to violate ERISA.'" *Humphreys v. Bellaire Corp.*, 966 F.2d 1037, 1043 (6th Cir.1992) (quoting *Rush v. United Techs., Otis Elevator Div.*, 930 F.2d 453, 457 (6th Cir.1991)). In the absence of direct evidence of such discriminatory intent, the plaintiff can state a prima facie case by showing the existence of "'(1) prohibited employer conduct (2) taken for the purpose of interfering (3) with the attainment of any right to which the employee may become entitled.'" *Id.* (quoting *Gavalik v. Continental Can Co.*, 812 F.2d 834, 853 (3d Cir.1987)); *see also Shahid v. Ford Motor Co.*, 76 F.3d 1404, 1411 (6th Cir.1996) (quoting same).

The Eighth Circuit has held that part of a plaintiff's prima facie burden under § 510 is to "demonstrate a causal connection between the likelihood of future benefits and an adverse employment action." *Kinkead v. Southwestern Bell Tel. Co.*, 49 F.3d 454, 457 (8th Cir.1995). Although we did not classify it as part of the plaintiff's prima facie case, we stated in *Humphreys* that a plaintiff must show "'a causal link between pension benefits and the adverse employment decision. In order to survive defendants' motion for summary judgment, plaintiff must come forward with evidence from which a reasonable jury could find that the defendants' desire to avoid pension liability was a determining factor in plaintiff's discharge.'" 966 F.2d at 1044 (quoting *Nixon v. Celotex Corp.*, 693 F.Supp. 547 (W.D.Mich.1988)). In *Mattei v. Mattei*, 126 F.3d 794 (6th Cir.1997), we discussed the requirements for establishing a claim under § 510 and noted that in an interference claim, "the alleged illegal activity will have a causal connection to the plaintiff's ability to receive an identifiable benefit." *Id.* at 808.

■ If the plaintiff states a prima facie case under § 510, the employer can rebut the presumption of impermissible action raised by the prima facie case by introducing "'evidence of a legitimate, nondiscriminatory reason for its challenged action.'" *Humphreys,*

966 F.2d at 1043 (quoting *Gavalik*, 812 F.2d at 853). This shifts the burden back to the plaintiff to show that the employer's proffered reason was mere pretext. Although the plaintiff "need not show that the employer's sole purpose ... was to interfere with [plaintiff's] entitlement to benefits," *Shahid,* 76 F.3d at 1411, he must "'either prove that the interference was a motivating factor in the employer's actions or prove that employer's proffered reason is unworthy of credence.'" *Id.* at 1413 (quoting *Humphreys,* 966 F.2d at 1043). Summary judgment is appropriate if plaintiff fails to establish a prima facie case or fails to rebut the employer's proffer of a legitimate, nondiscriminatory reason for its actions. *See id.*

The District Court found that the "temporal proximity of the union grievance and to Plaintiff's eligibility for long-term benefits may give rise to an inference of retaliatory motive, especially when coupled with Defendant's retroactive reclassification of Plaintiff's benefits for his final seven weeks of employment." It determined, nevertheless, that because plaintiff was no longer eligible for short-term or long-term disability benefits at the time defendants reclassified the payments and then discharged plaintiff, he had failed to present sufficient evidence from which a reasonable jury could find that plaintiff's discharge was motivated by a desire to interfere with his disability benefits.

■ We affirm the District Court's grant of summary judgment. Plaintiff does present evidence of the temporal proximity of the termination of his SADB Plan benefits and the termination of his employment to the date he would have become eligible for LTD plan benefits. In some cases, this might support an inference that the adverse actions were taken with the intent of interfering with future disability benefits. For example, we held that the plaintiff in *Humphreys* satisfied the burdens of stating a prima facie case by establishing the temporal proximity of adverse actions and the vesting of pension benefits. *Humphreys,* 966 F.2d at 1043–44. In this case, however, plaintiff has failed to

properly before us, and we consider only his claim of improper interference. *See, e.g., Enertech Elec., Inc. v. Mahoning County Comm'rs*, 85

F.3d 257, 259 (6th Cir.1996) (holding that appellant abandoned issues not raised on appeal).

make a showing that he qualified as "disabled" under the SADB and LTD plans and was entitled to benefits at the time his SADB benefits were terminated. Plaintiff's receipt of payments that were later reclassified from SADB Plan payments to another accounting category does not support an inference of intentional interference with future benefits; even if we assume that plaintiff received SADB Plan payments through October 19, 1994, he still fell short of the fifty-two weeks required for eligibility under the LTD Plan. Thus, it was not possible for this reclassification of benefits to have interfered with LTD payments. In short, plaintiff has failed to show that he was entitled to receive any long-term benefits or that he might have received long-term benefits had he not been discharged. Therefore, plaintiff's claim fails because he cannot establish a "causal connection between the likelihood of future benefits and an adverse employment action." *Kinkead*, 49 F.3d at 457; *see also Humphreys*, 966 F.2d at 1044 (stating that claimant must show a "causal link between pension benefits and the adverse employment action").

## C. Disability Discrimination Claim

Plaintiff also challenges the District Court's grant of summary judgment in favor of defendants on his claim alleging a failure to provide reasonable accommodation for his disability, in violation of the ADA. Because plaintiff has not challenged the District Court's decision granting summary judgment on his disability discrimination claim brought under OHIO REV.CODE ANN. § 4412.02(A), that claim is not before us, and we only consider the claim brought under the ADA.

Under the ADA, "[n]o covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). The ADA definition of the term "discriminate" includes "not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or an employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of the covered entity." *Id.* at § 12112(b)(5).

For his ADA claim to succeed, plaintiff must prove that (1) he has a disability; (2) that he is "otherwise qualified" for the job; and (3) that defendants either refused to make a reasonable accommodation for his disability or made an adverse employment decision regarding him solely because of his disability. *See Roush v. Weastec, Inc.*, 96 F.3d 840, 843 (6th Cir.1996). For the purposes of this motion for summary judgment, defendants have stipulated that plaintiff qualifies as an individual with a disability under the ADA. Our inquiry, therefore, is limited to whether plaintiff was "otherwise qualified" for his position, and whether he was denied reasonable accommodations.

The ADA defines the term "qualified individual with a disability" to mean "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The "disabled individual bears the initial burden of proposing an accommodation and showing that *that* accommodation is objectively reasonable." *Monette v. Electronic Data Sys. Corp.*, 90 F.3d 1173, 1183 (6th Cir.1996). The employer, however, bears the burden of persuasion on whether a proposed accommodation would impose an undue hardship. *Id.*

In the instant case, it is uncontested that plaintiff could no longer perform the essential functions of the position that he held before his injury. Plaintiff, however, argues that he could have been accommodated by being reassigned to a position as a collections agent and being allowed to work out of his own home. He asserts that because Ameritech provided this type of accommodation to an employee from Indiana who was disabled by multiple sclerosis, it would be reasonable for defendants to provide him with the same accommodation.

We agree with the District Court's conclusion that plaintiff has failed to raise a genu-

ine issue of fact as to whether he was an otherwise qualified individual with a disability. The only accommodation plaintiff proposed to allow him to perform the essential functions of his job was reassignment to a position permitting him to work from his home. In essence, plaintiff has requested two accommodations: transferral to a new position, and permission to work at home. Plaintiff has failed to show that either of these accommodations were objectively reasonable in this case.

■■■■ In some cases, reasonable accommodation under the ADA may include "job restructuring" or "reassignment to a vacant position." 42 U.S.C. § 12111(9)(b); *see also* 29 C.F.R. § 1630.2(*o*)(2)(ii). Plaintiff, however, has failed to show that any positions that would accommodate his disabilities were vacant while defendants tried to find a new job for him through their Medical Priority Placement program. The ADA does not require employers to create a new position for a disabled employee who can no longer perform the essential functions of his job. In *School Bd. of Nassau County v. Arline*, 480 U.S. 273, 107 S.Ct. 1123, 94 L.Ed.2d 307 (1987), the Court interpreted the Federal Rehabilitation Act's requirements and stated that "[a]lthough [employers] are not required to find another job for an employee who is not qualified for the job he or she was doing, they cannot deny an employee alternative employment opportunities reasonably available under the employer's existing policies." *Id.* at 289 n. 19, 107 S.Ct. at 1131 n. 19. Similarly, the ADA does not require an employer to reassign an employee to a position that is not vacant. *White v. York Int'l Corp.*, 45 F.3d 357, 362 (10th Cir.1995) (holding that "the ADA does not require an employer to promote a disabled employee as an accommodation, nor must an employer reassign the employee to an occupied position, nor must the employer create a new position to accommodate the disabled worker"). Thus, without evidence that there was an opening for a collections agent, plaintiff's requested accommodation is not objectively reasonable.

■■■■ Plaintiff's requested accommodation also would have required defendants to allow him to work from his own home. The Seventh Circuit has held that the ADA does not require employers "to allow disabled workers to work at home, where their productivity inevitably would be greatly reduced." *Vande Zande v. Wisconsin,* 44 F.3d 538, 545 (7th Cir.1995). The Fourth Circuit reached the same conclusion, holding that "[e]xcept in the unusual case where an employee can effectively perform all work-related duties at home, an employee 'who does not come to work cannot perform *any* of his job functions, essential or otherwise.'" *Tyndall v. National Educ. Ctrs., Inc.,* 31 F.3d 209, 213 (4th Cir.1994) (quoting *Wimbley v. Bolger,* 642 F.Supp. 481, 485 (W.D.Tenn. 1986), *aff'd,* 831 F.2d 298 (6th Cir.1987)). *But see Carr v. Reno,* 23 F.3d 525, 530 (D.C.Cir.1994) (stating that "in appropriate cases, [the Federal Rehabilitation Act] requires an agency to consider work at home, as well as reassignment to another position, as potential forms of accommodation"). We agree with the analysis of the Fourth and Seventh Circuits. Plaintiff has failed to present any facts indicating that his was one of those exceptional cases where he could have "performed at home without a substantial reduction in quality of [his] performance." *Vande Zande,* 44 F.3d at 544. This provides a second basis for our conclusion that plaintiff failed to propose an objectively reasonable accommodation for his disability.

■■■■ Plaintiff's reliance on defendants' provision of the same accommodation that he requested to a disabled employee in Indiana as evidence that he was denied reasonable accommodation is misplaced. An employer who provides an accommodation that is not required by the ADA to one employee is not consequentially obligated to provide the same accommodation to other disabled employees. *See Traynor v. Turnage,* 485 U.S. 535, 549, 108 S.Ct. 1372, 1382, 99 L.Ed.2d 618 (1988) (holding, with regard to ADA's counterpart for federal employers, that "[t]here is nothing in the Rehabilitation Act that requires that any benefit extended to one category of handicapped person also be extended to all other categories of handicapped persons"); *see also Myers v. Hose,* 50 F.3d 278, 284 (4th Cir.1995) ("[T]he fact that certain accommodations may have been offered ... to some

employees as a matter of good faith does not mean that they must be extended to [plaintiff] as a matter of law."). As the Fourth Circuit reasoned in *Myers*, if the ADA required employers to offer all disabled employees an accommodation that it provided "to some employees as a matter of good faith," then "a good deed would effectively ratchet up liability." 50 F.3d at 284. This would deter employers from providing greater accommodations than are required by law. "Discouraging discretionary accommodations would undermine Congress' stated purpose of eradicating discrimination against disabled persons." *Id.* We find, therefore, that defendants' provision of a certain accommodation to one disabled employee does not automatically entitle plaintiff to the same accommodation.

Because plaintiff failed to propose an objectively reasonable accommodation for his disability, and because it is undisputed that plaintiff could not perform the essential functions of his position, we conclude that he has failed to create a genuine issue regarding whether he was an otherwise qualified individual with a disability. For this reason, the District Court properly granted summary judgment on plaintiff's ADA claim.

### D. Breach of Collective Bargaining Agreement Claim

Plaintiff's final argument on appeal is that the District Court incorrectly granted summary judgment on his claim that defendants breached the collective bargaining agreement that controlled plaintiff's employment by discharging him without "just cause." The District Court found that it was undisputed that plaintiff could no longer perform the essential functions of his position, thereby providing an employer with "a justifiable reason" for discharging that employee and satisfying the definition of "just cause" under Ohio law. *Irvine v. Unemployment Compensation Bd.,* 19 Ohio St.3d 15, 17, 482 N.E.2d 587, 589 (1985).

■ We affirm the District Court's grant of summary judgment on this claim for a different reason. Insofar as plaintiff attempts to assert a state-law claim alleging that defendants breached a collective bar-

gaining agreement, his claim is preempted by § 301 of the Labor Management Relations Act, 29 U.S.C. § 185(a). *See, e.g., Lingle v. Norge Division of Magic Chef, Inc.,* 486 U.S. 399, 405-06, 108 S.Ct. 1877, 1881, 100 L.Ed.2d 410 (1988) ("[I]f the resolution of a state-law claim depends upon the meaning of a collective bargaining agreement, the application of state law ... is pre-empted."); *accord Jones v. General Motors Corp.,* 939 F.2d 380, 382 (6th Cir.1991).

■ We therefore interpret plaintiff's claim as a § 301 suit for breach of a labor contract, and it is clear that it must fail. To establish a claim under § 301, a plaintiff must show (1) that the union breached its duty of fair representation, and (2) that the company breached the collective bargaining agreement. *See, e.g., Bagsby v. Lewis Bros., Inc.,* 820 F.2d 799, 801 (6th Cir.1987). Summary judgment is appropriate in this case because plaintiff failed to allege that the union breached its duty of fair representation.

### III. Conclusion

For the foregoing reasons, we affirm the District Court's order granting summary judgment in favor of defendants on all of plaintiff's claims.